UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
OCALA DIVISION

UNITED STATES OF AMERICA

v.                                                                               Case No. 5:21-cr-75-JA-PRL

ELIAS CHIROY-CAC

_____/

### OBJECTIONS TO MAGISTRATE JUDGE'S REPORT AND RECOMMENDATION ON DEFENDANT'S MOTION TO DISMISS

NOW COMES Defendant, Elias Chiroy-Cac, by and through undersigned counsel, and objects to the magistrate judge's report and recommendation on his motion to dismiss.

### MEMORANDUM OF LAW

Mr. Chiroy-Cac moved to dismiss the indictment, arguing that the statute under which he is charged, 8 U.S.C. § 1326, is unconstitutional because it was enacted with a purpose of discriminating against Mexicans and other Latinos, and has had such an effect.  The magistrate judge's report and recommendation ("R&R") applies (without expressly adopting) the correct legal framework, that of *Village of Arlington Heights v. Metropolitan Housing Development Corp.*, 429 U.S. 252 (1977).  (Doc. 63, p. 4).  The R&R correctly finds as a matter of fact that Mr. Chiroy-Cac has successfully proven one component of an *Arlington Heights* claim, disparate impact.  (*Id*. at 5-6).  This Court should adopt that disparate-impact finding.

However, the R&R goes on to find that Mr. Chiroy-Cac has failed to show the

other component of an *Arlington Heights* claim, discriminatory purpose. Mr. Chiroy-Cac objects to these factual findings and legal conclusions.

Broadly speaking, the R&R errs in three ways: (1) by almost completely discounting the weight of Mr. Chiroy-Cac's evidence that the original enactment of the crime of illegal reentry was borne of racial animus; (2) by failing to consider other evidence altogether, namely the history of the crime of illegal reentry between its original enactment and the enactment of § 1326 in 1952, and the passage of the so-called "Wetback Bill" contemporaneously with § 1326; and (3) by considering each item of evidence in isolation, rather than together. When all of Mr. Chiroy-Cac's evidence is considered together, as the law requires, he has met his burden of showing a discriminatory purpose under *Arlington Heights*.

Mr. Chiroy-Cac has presented overwhelming evidence that the original criminalization of illegal reentry in the Undesirable Aliens Act of 1929 was born of racial animus toward Latinos. The 1929 act had the twin racist goals of providing cheap and exploitable labor to agricultural businesses while separating Latinos from the general public to prevent race mixing. *See United States v. Machic-Xiap*, __ F. Supp. 3d ___, 2021 WL 3362738, at *12 (D. Or. 2021), *appeal docketed*, No. 22-30023 (9th Cir. Feb. 4, 2022). The Government has not seriously contested this evidence, and the R&R implicitly accepts it. (*See* Doc. 63, p. 6).

The R&R takes great pains to establish that Congress's racist motivation behind

the Undesirable Aliens Act in 1929 is not per se dispositive of Congress's intent in enacting § 1326 in the Immigration and Nationality Act (INA) of 1952. (Doc. 63, pp. 6-8). Mr. Chiroy-Cac agrees. The Supreme Court made clear that the motivations of a previous legislature cannot be automatically imputed to a later legislature in *Abbott v. Perez*, 138 S. Ct. 2305, 2324 (2018). But the Court made just as clear that the prior legislature's intent can constitute *evidence* of the later legislature's intent, and the weight that it should be afforded depends on the circumstances of the case. *See id*. at 2327. Discussing the electoral districting plans at issue in that case, the Court explained:

> [W]e do not suggest either that the intent of the 2011 Legislature is irrelevant or that the plans enacted in 2013 are unassailable . . . . Rather, both the intent of the 2011 Legislature and the court's adoption of the interim plans are relevant *to the extent that they naturally give rise to–or tend to refute–inferences regarding the intent of the 2013 Legislature*. They must be weighed together with any other direct and circumstantial evidence of that Legislature's intent.

*Id*. (emphasis added).

Here, the racist intent of the 1929 Congress, when considered in the proper context and along with all the other evidence presented by Mr. Chiroy-Cac, "naturally give[s] rise to" a strong inference that the 1952 Congress intended to discriminate against Latinos in the enactment of § 1326. Persuaded by the pseudoscience of eugenics and bare racial animus, Congress in 1929 enacted the Undesirable Aliens Act to specifically target Mexican immigrants. The act achieved its drafters' goals splendidly. The number of

3

border-crossing prosecutions immediately soared, with up to 99% of defendants being Mexican. (*See* Doc. 25, p. 7) (citing Kelly Lytle Hernández, *City of Inmates: Conquest, Rebellion, and the Rise of Human Caging in Los Angeles, 1771-1965* 138 (UNC Press 2017)).

This was the history and context of illegal reentry the 1952 Congress faced when it considered and enacted § 1326: a crime enacted with an overwhelming purpose of racial animus, with an overwhelmingly discriminatory impact on the very group targeted for harm. The status quo background against which the 1952 Congress legislated was discriminatory purpose and effect. *See Greater Birmingham Ministries v. Sec'y of State for State of Ala.*, 992 F.3d 1299, 1321-22 (11th Cir. 2021) (citing *Arlington Heights*, 429 U.S. at 267-68; *Jean v. Nelson*, 711 F.2d 1455, 1486 (11th Cir. 1983)) (explaining that courts consider "the historical background," "the foreseeability of the disparate impact," and "knowledge of that impact" under *Arlington Heights*, among other factors).

With that background in mind, evidence from the 1952 enactment of the INA further supports the inference that Congress embraced or accepted the discriminatory status quo when including § 1326. Contemporaneously with its consideration of the INA, Congress debated the so-called "Wetback Bill." The bill, designed "to assist in preventing aliens from entering or remaining in the United States illegally," proposed to make it a felony to transport or harbor illegal aliens. Its supporters decried the "wetback problem," explaining that Mexican immigrants "may be criminals because they are wetbacks. They can be kept in a state of peonage." (Exhibit Q, p. 107) (describing the

4

statements of Senator Kilgore). The bill excepted employment from the definition of "harboring," allowing employers of illegal immigrants to avoid liability. The Wetback Bill's purpose and carve-out for employers thus closely parallel the purposes and compromises in the Undesirable Aliens Act that came before it. (*See* Exhibit Q, pp. 185-86). The Wetback Bill passed just three months before the INA. 82d Cong. Ch. 108, Mar. 20, 1952, 66 Stat. 26. Considered alongside the historical background of illegal reentry and the passage of the INA, the Wetback Bill's "passage is particularly probative because it was passed by the same congress during the same time frame and with the same express aim as illegal reentry." *See United States v. Carrillo-Lopez*, __ F. Supp. 3d __, 2021 WL 3667330, at *14 (D. Nev. 2021), *appeal docketed*, No. 21-19233 (9th Cir. Aug. 20, 2021) (internal quotation omitted).

Having separately debated and enacted the Wetback Bill, the 82nd Congress turned toward the INA, which included the illegal reentry crime codified at § 1326. Representative Wood expressly urged his colleagues to again consider racial discrimination, stating:

> It seems to me the question of racial origins, though I am not a follower of Hitler, there is something to it. We cannot tie a stone around its neck and drop it in the middle of the Atlantic, just because it worked to the contrary in Germany. The fact still remains that the peoples of western Europe have made good American citizens. I believe that possibly statistics would show that the western European races have made the best citizens in America.

5

(Exhibit Q, pp. 116-17).

Congress gave robust debate to many aspects of immigration policy deemed racially problematic, such as the Johnson-Reed Act of 1924, but almost no debate centered around the illegal reentry crime enacted in 1929 – an imbalance that, itself, suggests that the legislators accepted the racist history and purpose of the crime, taking it as a given.  (*See* Exhibit Q, pp. 180-81).  There was just a single exception to the silence on illegal reentry, a letter submitted for the record from Deputy Attorney General Peyton Ford.  (Exhibit P).  Ford praised a proposed change that would make proper venue easier to prove, and suggested a clarification to the statute's affirmative defense.  (Exhibit P, p. 716).  A few pages later, the letter quoted from a report praising another aspect of the INA because it would "'aid in taking action against the conveyors and receivers of the wetback.'"  (Exhibit P, p. 718).  Congress adopted both of Ford's suggestions for § 1326. Thus, while Congress largely ignored § 1326 in debating the INA, what discussion did occur was tainted by racial animus, and was apparently adopted by Congress.

When Congress passed § 1326 with Ford's suggestions, along with the rest of the INA, President Truman vetoed it.  In a veto statement, President Truman explained that the INA was "legislation which would perpetuate injustices of long standing against many other nations of the world" and "intensify the repressive and inhumane aspects of our immigration procedures." *Veto of Bill To Revise the Laws Relating to Immigration, Naturalization, and Nationality* (June 25, 1952) *available at*

6

trumanlibrary.gov/library/public-papers/182/veto-bill-revise-laws-relating-immigration-naturalization-and-nationality.  The message focused in detail on the racially discriminatory quota system inherited from the 1920's and retained with only minor revisions in the INA.  President Truman praised some aspects of the bill but found that they were "heavily outweighed" by provisions that "would continue, practically without change," the discriminatory provisions put into place in 1924 and 1929.

Having criticized the quota system, President Truman turned to "other provisions of the bill," including those dealing with "the administration of the laws."  President Truman wrote, "In these provisions too, I find objections that preclude my signing of the bill."  President Truman explained:

> Many of the aspects of the bill which have been most widely criticized in the public debate are reaffirmations or elaborations of existing statutes or administrative procedures.  Time and again, examination discloses that the revisions of existing law that would be made by the bill are intended to solidify some restrictive practice of our immigration authorities, or to overrule or modify some ameliorative decision of the Supreme Court or other Federal courts.  By and large, the changes that would be made by the bill do not depart from the basically restrictive spirit of our existing law – but intensify and reinforce it.

President Truman asked, "Should we not undertake a reassessment of our immigration policies and practices in the light of the conditions that face us in the second half of the twentieth century?"  He wrote, "I hope the Congress will agree to a careful examination of this entire matter."  Congress overrode the veto two days

later.

Congress's passage of the INA in the face of President Truman's veto and message provides further evidence of racial animus in the enactment of § 1326. President Truman expressly tied the quota proposals of the INA to the discriminatory enactments of the 1920's, and highlighted where the discrimination persisted. While President Truman did not address § 1326 specifically, he noted that the INA was "a long and complex piece of legislation. It has 164 separate sections, some with more than 40 subdivisions." Turning from the quota system to those dealing with "the administration of the laws," President Truman charged that these were "reaffirmations or elaborations of existing statutes . . . intended to solidify some restrictive practice of our immigration authorities" and "intensify and reinforce" "the basically restrictive spirit of our existing laws . . . ." This description fits § 1326 perfectly: a racist relic of the Undesirable Aliens Act of 1929, § 1326 simply reaffirmed and elaborated on prior law to intensify and reinforce it. But Congress enacted it over President Truman's veto nonetheless.

Since legislatures are rarely "motivated solely by a single concern," Mr. Chiroy-Cac need not show that Congress's decision "rested solely on racially discriminatory purposes." *See Arlington Heights*, 429 U.S. at 265–66. Instead, he need only show "proof that a discriminatory purpose has been a motivating factor in the decision." *Id.* Considered together, as *Perez* commands, Mr. Chiroy-Cac's

8

evidence paints a clear picture of a Congress that allowed racial animus against Latinos to be "a motivating factor" in the enactment of § 1326.  Congress made no secret in 1929 of its purpose of harming Mexicans in furtherance of eugenics and racial nativism.  In the ensuing 23 years, the law worked just as intended, with an overwhelmingly disparate impact on Mexicans.

With this historical background, when the 82nd Congress took up immigration reform in 1952, it began with the racist-in-name-and-purpose "Wetback Bill."  The Wetback Bill matched the Undesirable Aliens Act in its purpose of criminalizing Latinos' immigration, in the racist debate surrounding it, and in its political carveout for agricultural businesses, perpetuating the approach of Congress in 1929.  The formal debate on the INA contemporaneous with the Wetback Bill included Representative Wood's support for racism, robust debate on many of the racial aspects of the bill, and relative silence on the crime of illegal reentry.  What debate on illegal reentry did occur came in the form of Ford's letter, which was characterized by racist language, and whose suggestions for § 1326 were ultimately adopted by Congress.  President Truman vetoed the bill, pointing out that provisions like § 1326 simply reaffirmed existing law and intensified its effects, but Congress overrode the veto.  Considered together, this evidence amply shows that racial animus was at least a "motivating factor" in the passage of § 1326.  The burden therefore shifts to the Government to show that Congress would have enacted § 1326

even without this motivating factor. *See Greater Birmingham Ministries*, 992 F.3d at 1321 (citing *Hunter v. Underwood*, 471 U.S. 222, 228 (1985)).

The R&R finds to the contrary, first by discounting the history of illegal reentry before 1952. (Doc. 63, pp. 7-8). The R&R explains that the prior Congress's racial animus is not dispositive, states that it is "of little weight," and goes on to examine the enactment of the INA in a vacuum, without any reference to the history that preceded it. But while *Perez* established that a prior legislature's motive is not necessarily dispositive and the burden is always on the challenger, it just as clearly established that the prior legislature's motive can be evidence of the later legislature's motive, and the weight afforded that evidence depends on the circumstances – "to the extent [the previous motive] naturally give[s] rise to–or tend[s] to refute– inferences regarding the intent" of the 82nd Congress. *See Perez*, 138 S. Ct. at 2327. And here, Congress's racial animus in 1929 naturally gives rise to a strong inference that Congress in 1952 harbored the same racial animus. The R&R's failure to consider Congress's racial animus in the 1929 enactment of the crime of illegal reentry for what it says about Congress's intent in 1952 is error under *Arlington Heights* and *Perez*. *See Greater Birmingham Ministries*, 992 F.3d at 1321 (providing "the historical background" as a factor for consideration under *Arlington Heights*).

Having discounted the historical background for § 1326, the R&R fails to consider the history of the offense between 1929 and 1952 at all. But this history – showing that

10

the 1929 law worked as intended by disparately harming Mexicans to an overwhelming degree – is what the 1952 Congress was working with when it sat down to reform immigration law.  That this discriminatory effect persisted between 1929 and 1952, and that Congress chose to do nothing to ameliorate it, is strong evidence that the 82nd Congress accepted or embraced the 1929 law's purpose and effect.  *See id*. (providing "the foreseeability of the disparate impact" and "knowledge of that impact" as factors for consideration).

Next, the R&R overlooks the Wetback Bill entirely.  But the 82nd Congress's contemporaneous passage of the Wetback Bill, with its purpose and legislative history closely matching those of the Undesirable Aliens Act, is among the strongest evidence of Congress's racial animus in the enactment of § 1326.

Finally, the R&R does consider the debate on the INA, and President Truman's veto.  The R&R discounts Representative Wood's support for racism as the comment of just one legislator, the Ford letter as the position of a non-legislator, and the veto statement as the position of the bill's opponent.  The R&R then characterizes these items of evidence as "isolated instances," and finds that Mr. Chiroy-Cac has failed to meet his burden of showing that racial animus was "a motivating factor" behind § 1326.

But these instances are only isolated if one purposefully isolates them.  Considered in light of all of Mr. Chiroy-Cac's evidence – the racist purpose behind

11

the original enactment of the crime, the discriminatory effect between 1929 and 1952, the Wetback Bill, and the relative silence in the debate on § 1326 when compared to other provisions – the Wood statement, the Ford letter, and the Truman veto provide powerful corroborating evidence that racial animus was at least "a motivating factor" in the enactment of § 1326.  The discriminatory-purpose component requires "a sensitive inquiry into such circumstantial and direct evidence of intent as may be available." *Arlington Heights*, 429 U.S. at 266.  When all available evidence is considered together, Mr. Chiroy-Cac has exceeded the burden placed on him.[*]

Accordingly, this Court should reject the R&R and grant Mr. Chiroy-Cac's motion.

A. FITZGERALD HALL, ESQ
FEDERAL DEFENDER

*/s **Samuel E. Landes***
Samuel E. Landes, Esq,
D.C. Bar No. 1552625
400 North Tampa Street, Ste. 2700
Tampa, Florida 33602
Email: Samuel_Landes@fd.org

---

[*] The R&R states that "Defendant has not challenged Congress's repeated modifications of the INA . . . ." (Doc. 63, p. 10 n.8).  As Mr. Chiroy-Cac explained in his Reply, (Doc. 40, pp. 8-11), Congress's later modifications to § 1326 are irrelevant under *Arlington Heights*.  *See Perez*, 138 S. Ct. at 2325 (discussing the holding in *Hunter*).

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on this 11th of February 2022, a true and correct copy of the foregoing was filed with the Clerk of the Court using the CM/ECF system, which will send a notice of the electronic filing to AUSA William Hamilton.

/s *Samuel E. Landes*
Samuel E. Landes, Esq.
Assistant Federal Defender